**David J. LANG, Appellant,**

v.

**Norma Jean LANG, Appellee.**

**No. 50108.**

Court of Appeals of Oklahoma, Division 2.

Nov. 1, 1977.

Released for Publication by Order of Court of Appeals Dec. 1, 1977.

Monnet, Hayes, Bullis, Thompson & Edwards, Oklahoma City, for appellant.

J. Edward Barth, Bohanon & Barth, Oklahoma City, for appellee.

BRIGHTMIRE, Presiding Judge.

The pawn in this lengthy struggle for custodial supremacy is a little 10-year-old girl born to the parties in 1967 during a marriage which ended in divorce in 1973. Under attack is the trial court's refusal to grant enforcement relief to the appealing father relating to a child custody order because the order had been validly modified a few days earlier by a California court. We hold the trial court made the right decision and affirm.

## I

On March 7, 1973 the Oklahoma court dissolved a marriage that had existed between the parties since May of 1964. After dividing the property the court awarded custody of the minor child, Deborah, to Norma Jean Lang, her mother, and authorized the former FBI agent to visit his child at specific times during the school year and have "summer custody for a period of one month beginning anytime during June, July and the first week of August during the summer of 1973, and each summer thereafter . . . .." The decree also provided that "if the [mother] shall reside in a city other than the one resided in by the plaintiff, it shall be incumbent upon the plaintiff to travel to defendant's residence to secure the minor child and he shall be required to accompany the child on her return to the defendant's residence at the end of the allotted period."

Four months later David Lang filed a motion to suspend payment of child support and alimony and to modify the decree. The primary complaint at that time was that defendant had moved to Charleston, South Carolina, and was refusing to permit plaintiff to exercise reasonable visitation with his daughter either in person or by telephone and under these circumstances he felt that the court should modify the existing decree either by awarding custody of the child to her father or by allowing the child to travel by airline unaccompanied by him to his residence for the prescribed visitation or, as a third alternative, by making specific provision for plaintiff to enjoy "uninterrupted telephone visitation rights" with the child.

Before this motion could be heard Norma Jean struck back with an application to the Oklahoma court to cite David for contempt and punish him for failing to transfer to her one-half of all the stock he had received from distribution of the estate of a deceased relative as required by one of the provisions in the decree of divorce, and to the South Carolina court for a modification of the Oklahoma decree to the extent of

prohibiting Deborah's removal from South Carolina.

Both of the Oklahoma matters were taken up on the 14th day of September, 1973 and the court modified the divorce decree to the extent of changing David's child visitation periods and authorizing his daughter to travel between plaintiff's residence and that of defendant's unaccompanied by plaintiff commencing with the month of visitation during the summer of 1974. The decree was further modified by giving David reasonable telephone visitation privileges with his daughter and he was ordered to complete the transfer of one-half the stock he had received from the estate of a deceased relative.

On June 18, 1974 Norma Jean filed in this case a motion to modify the September 14 order insofar as it authorized the minor child to travel between the residences of plaintiff and defendant unaccompanied by plaintiff. The allegations in the motion indicate that in the meantime mother and child had moved from South Carolina to San Mateo County, California where the mother's parents lived. As a basis for her motion she attached what purported to be a copy of a "report" of James A. Buckley, M.D. whose letterhead indicated he was a general practitioner in Belmont, California. In it the doctor said simply, "Debbie Lang is showing definite signs of hyperventilation [1] regarding an air flight by herself." The record does not indicate what disposition was made on this motion.

In March 1976 Norma Jean Lang instituted proceedings in the Superior Court of the State of California to obtain a modification of the Oklahoma divorce decree to the extent of prohibiting Deborah from being removed from California thereby requiring her father to visit her in California. Notice was given David Lang who entered his appearance in the California court through an attorney.

On April 30, 1976 David counterattacked by filing in this case a motion to modify the September 1973 order charging Norma Jean with having a "perverted possessive attitude . . . in her parent-child relation with said minor child [which] is causing serious emotional disturbance of said child to the extent that she is developing a marked sensation and preoccupation with death and is experiencing some form of petit mal (epilepsy), that the plaintiff herein has remarried and lives and works in the real estate business in Sapulpa, Oklahoma; that his wife is not presently employed and would be available to care for said minor child and that the best interests of said child in respect to temporal, mental and moral welfare would be to place said child in the permanent custody of the plaintiff."

The game plan now focused on each party trying to legally outmaneuver the other. The father's motion was heard and relief was denied on June 25, 1976. Four days later the father wrote the mother the following letter:

"Pursuant to the judgment entered on June 25, 1976, in which Judge Hester ordered that all previous Orders of the trial court (Oklahoma County District Court) effecting [sic] custody and visitation rights be maintained in full force and effect, I am requesting my Court ordered summer visitation with Debbie to begin on July 15, 1976, and end on August 14, 1976. This visitation will be based around my home in Sapulpa, Oklahoma.

"Accordingly, the following airplane reservations have been made for Debbie: Leave San Francisco International Airport at 8:00 AM, July 15, 1976, by American Airlines flight number 462, arriving at Tulsa, Oklahoma, at 1:57 PM; Leave Tulsa, August 14, 1976, at 3:05 PM by American Airlines flight number 233, ar-

---

1. Hyperventilation merely means more than a normal amount of air is being taken into and exhaled from the lungs and is usually accomplished by fast or deep breathing secondary to apprehension or excitement. If hyperventilation is carried to extremes by intentional facts or deep breathing it can cause dizziness and fainting due to an abnormal oxygenation of the body cells, reducing the carbon dioxide tension. *Dorland's Illustrated Medical Dictionary* (24th ed. 1965).

riving at San Francisco at 5:13 PM. The prepaid tickets may be picked up at the American Airlines ticket counter any time after July 2, 1976.

"These dates have been chosen to allow you sufficient time to prepare Debbie for the month. I shall assume that these dates will be acceptable to you unless I hear from you to the contrary on or before July 10, 1976.

"As I understand your plans for this summer, a trip has been planned to visit with my mother in Spokane. If your plans overlap slightly with the above dates, we have a limited amount of flexibility, and I'm sure that should you let us know of a conflict in sufficient time that the dates could be negotiated within the limits of a personal matter, to our mutual satisfaction, and in conformity with the June 25, 1976 judgment. The trial Court ordered and/or awarded summer visitation with the Father, of course, takes precedent over personal visitation with the Father's mother."

The father purchased and mailed to the mother an airline ticket on July 1, 1976. The mother refused to send the child to Oklahoma and payment for the tickets was refunded on July 10, 1976, thus laying the foundation for a contempt citation which the father applied for shortly after the date (July 15) passed.

Apparently hoping for an early hearing of her California motion the mother then sought and got a postponement of a hearing on the father's application until August 16. In the meantime on August 13, 1976 she got her California motion before the court. The father appeared at the hearing through an attorney. At the close of the evidence the court found that it had jurisdiction both over the parties and of the subject-matter and that the minor child, who was the subject of the action, was and had been a resident of the state of California for more than three years—apparently a time requirement imposed by California law.[2] Ignoring the recent custody hearing held in Oklahoma (June 25, 1976) the California trial court further concluded that all visitation of the minor child with her father "shall be within the State of California until this court orders otherwise" and that both parties "are restrained and enjoined from removing said child from the State of California without the prior approval of this Court or until further order of this court." The order then went on to spell out specific times during which the father had a right to visit with his daughter in California, namely, for a month during the summertime and two weeks at the Christmas period of the year on alternate years. Parenthetically, it seems to us that the object of the order is somewhat punitive in nature, intended to constructively deprive the father of any significant visitation with his daughter. For if spending a month with the father any place he may choose in the vast state of California—maybe even in some remote wilderness area—does not place the child's welfare in jeopardy, it is not clear why spending the same time in Oklahoma would.

Armed with this order, however, the mother's attorneys appeared before the Oklahoma court on August 16. After hearing argument and reviewing the record, the trial judge concluded that he should not exercise jurisdiction to entertain the citation "for the reason that this Court must give full faith and credit to said Order of the Superior Court of the State of California" and he therefore dismissed the contempt citation against the mother as "moot."

It is from this order of dismissal that the father appeals.

---

**2.** The record does not disclose exactly when Norma Jean moved from South Carolina to California but it does show that she filed a "Special Appearance—Objection to Jurisdiction" in this case on August 23, 1973 stating that she "is a resident of the State of South Carolina . . . ." The move to California was evidently made between this date and June 18, 1974 because on the latter date Norma Jean filed a motion to modify in this case about Deborah "journeying to Oklahoma from California unescorted." Under these circumstances on August 13, 1976 Deborah and her mother would not have been residents of "California for more than three (3) years last past" as found to be the fact in the superior court order.

## II

Appellant argues that the dismissal was wrong because the complained of contemptuous conduct occurred before there was any modification of the September 14 order and that even if the California court had jurisdiction to make the August 13 modification, still it did not relieve the mother of her earlier obligation to comply with the Oklahoma court's existing and unmodified order in June 1976, and under these circumstances the court clearly had jurisdiction to punish the offending mother for failing to send Deborah to Oklahoma in July.

As we read the court order complained of, the trial judge did not hold he lacked jurisdiction to entertain the father's application but declined to exercise his jurisdiction because the California court order caused the question of whether the mother had been guilty of civil indirect contempt as charged by the father to become academic.

The first important question that arises is not whether the California order was entitled to be given full faith and credit but whether under the Oklahoma law the trial court should have yielded to the west coast order as a matter of comity?

The Oklahoma Supreme Court has on several occasions passed on some of the questions which can arise out of potentially conflicting child custody orders of different states, and for the most part have been more submissive to foreign court orders and less protective of its own custodial orders than other states. The latest decision on the subject is *Duncan v. Seay*, Okl., 553 P.2d 492 (1976) and it contains a review of prior relevant decisions dealing with the question of when or under what circumstances the courts of this state will relitigate a child custody issue previously adjudicated in a sister state. In its distilled form the Oklahoma law, as it has been thus far developed, is that the courts of this state will not, as a matter of comity, disregard a valid custodial order of another state unless

one of two circumstances is shown: (1) the minor child has been lawfully brought into this state, and is not being illegally detained; or (2) it is alleged and proved that the welfare of the child is in jeopardy.

Unhappily the facts of this case are such that the *Duncan* doctrine does not afford a clear-cut answer to the question they raise. There are at least two significant distinguishing features. First of all the proceeding below is not a "relitigation" of a California order but an attempt of one party to enforce a valid Oklahoma decree which was granted no comity by the lower California court but was relitigated at the request of a mother who sought and failed to obtain modificatory relief in Oklahoma. Secondly, at the very time the California court undertook to modify the Oklahoma decree the mother was detaining the minor child in California in derogation of the Oklahoma court order.[3]

We, of course, do not know what the California law is with regard to child custody cases nor does it matter insofar as a resolution of the present problem is concerned because our sole interest is in determining whether the courts of this state should defer to the California order as a matter of comity under the circumstances and if so what effect this will have on the contempt proceedings below.

If we view the action of the California court from the standpoint of the comity policy adopted in this state it would appear that the court should have declined to exercise its jurisdiction out of deference to the Oklahoma decree in view of the mother's violation of it unless she pleaded and proved that the welfare of the child was in jeopardy. An examination of the record discloses that such exception was alleged, proved and adjudicated by the California court. In her request for the California modification filed in March of 1976 the mother filed a supporting declaration of facts in which she said:

> very period that the California court changed the order on August 13, 1976 at the request of a party who was at that time violating it by detaining the minor child in California.

---

**3.** This conclusion is based upon the fact that the father requested he have Deborah's custody from July 15 to August 14, 1976, as ordered by the court of this state and it was during this

"I, the undersigned, under penalty of perjury, do state as follows:

"I am the defendant/respondent above-named.

"On March 7, 1973, the District Court, Oklahoma County, State of Oklahoma, made and entered its Decree of Divorce and included within said Decree, inter alia, was a provision that the care, custody, control and education of the minor child, Deborah B. Lang, born May 18, 1967, be awarded to me, subject to the plaintiff/petitioner's right of reasonable visitation, which was established as alternate weekends, summer for a period of one month, and alternate Christmas vacations for a period of two weeks. The Decree further provided that it was incumbent for plaintiff/petitioner to travel to my residence and to accompany the child on the child's return to my residence. This provision relative to traveling was modified by an order of the court made on September 14, 1973, to permit the minor child to travel unaccompanied by the plaintiff/petitioner nor to accompany the child's return to my residence.

"Shortly after the divorce in March 1973, I moved to South Carolina to be with my relatives who could assist me in raising Deborah, however, by August 1973, (three months after moving to South Carolina), I determined to move to California where my parents lived as they could afford me greater assistance with Deborah especially now that I am attending court reporter school at Canada College, CSM, San Mateo, California. While in South Carolina, because of the plaintiff/petitioner's conduct it was necessary to envoke [sic] the protective mantle of the Family Court, Charleston County, South Carolina to prevent the plaintiff/petitioner from removing the child from South Carolina. The reason in seeking the Family Court's protection was because of the emotional and psychotic problems of plaintiff/petitioner (which are hereafter more fully described) and which were, and I am informed and believe and thereupon allege still are extensive. The court made its order af-

ter a long hearing enjoining the plaintiff/petitioner from removing the child from South Carolina.

"I am further informed and believe and thereupon allege that the plaintiff/petitioner suffers from severe headaches, which immobilize him at times and in many ways cause him to act in a bizzare [sic] and strange manner. The severity of the headaches cause the plaintiff/petitioner to take large amounts of analgesics both prescribed and nonprescribed and also from time to time to use marijuana, as well as an assortment of many other pills.

"All of his bizzare [sic] acts had a dilatorious [sic] affect [sic] upon my daughter. Last summer, for example, while visiting her father, Deborah developed a morbid inquiry into the ingesting of cleansers and other lethal substances inquiring as to the quantity it would require for her to die. This developed because the present Mrs. Lang's father committed suicide and Deborah was taken to the grave and explained to in great detail about his death and often thereafter and as often as Deborah wanted to return to the gravesite the plaintiff/petitioner and his present wife would take her there. Because of their obsession with suicide and because of the way she was treated in Oklahoma while visiting her father, Deborah became suicidal and her father took her to Doctor Parrish, a clinic[al] psychiatrist in Oklahoma. Even though she was only then 8 years of age, she was treated with transactional analysis.

"Upon Deborah's return to California, it was obvious that she was ill and I took her to Doctor James Buckley, Belmont, California, who diagnosed petit mal epilepsy and also because of her morbid sensation about death, then recommended that she be treated by Doctor David Freeman, Psychologist, and thereafter, I had extensive counseling given to Debbie by Doctor Freeman and she has made a good recovery.

"Doctor Freeman has determined that Deborah's underlying problem is a[n] irre-

solvable conflict in that she believe[s] the present Mrs. Lang caused the divorce between her parents which, of course, is not completely true and I have tried to explain it to Deborah. Deborah has great hostility and anger towards [sic] the present Mrs. Lang and she does not want to be with her even though she is reluctant to express this concept.

"Doctor Freeman has advised me that it would be extremely ill-advised for Deborah to visit her father in Oklahoma and she further should not, at any time, visit the stepmother in Oklahoma or any where [sic] and I, therefore, request that this court made [sic] its order modifying the prior Decree to provide that all visits be here in California and be in a supervised nature.

"This is the proper court to hear this proceeding as the plaintiff/petitioner until he entered the FBI and ultimately resigned because of ill health, was a native of California, and lived here until being transferred in his work. I myself have lived in California ever since 1958, except for those times absent because of the plaintiff/petitioner's appointments. We were married in San Jose, on May 29, 1964, and then transferred in 1967 to Colorado and then for a short time in Washington D.C., and then ultimately to Oklahoma in the fall of 1967. After the divorce in 1973, I went to South Carolina for a few months and then in August 1973, moved to Belmont, California, San Mateo County, accompanied with Deborah. Deborah has been with me continuously since her birth.

"The most convenient place for the hearing is the Superior Court in and for the County of San Mateo, State of California, inasmuch as Deborah and I have been here for nearly three years, Doctor Freeman and Doctor Buckley are both witnesses and the ends of justice will be best served by having the hearing in the Superior Court, San Mateo County.

"Executed at San Mateo, California, this 26th day of March 1976, under the penalty of perjury."

After a hearing attended by the father's attorney, the court found that (a) he had jurisdiction over the parties and of the subject-matter, and (b) "[t]he [w]elfare and interest of the minor child Deborah B. Lang, requires that the order heretofore made by the Oklahoma District Court . . . as to visitation be modified so that all visitation by the petitioner with the minor child shall be in the State of California." [4]

While the order does seem harsh and unfair to the father, the California court did not proceed contrary to the public policy of this state and, therefore, the relitigation order should be recognized as a valid judgment binding on the parties.

The next question then is whether by reason of such recognition the mother's defiance of the Oklahoma order becomes in this case an academic question? We think it does. The citation issued to the mother called for her to respond to an indirect civil contempt of court charge brought in the original action by the father not to vindicate the dignity of the court but to enforce his rights under the Oklahoma decree. Under ordinary circumstances contemptuous defiance of an existing order can be enforced for the benefit of a party by resort to coercive measures, such as imprisonment, not to punish the noncomplying party but to force his compliance. *Ex parte Hibler,* 139 Okl. 157, 281 P. 144 (1929).[5] With reference to a child custody order such enforcement obviously can operate prospectively only. And so in the instant case,

---

4. Notwithstanding the mother's allegations it should be mentioned that both parties' experts agreed that Deborah loved both her parents and her basic problem was failing to accept their separation. The so-called "morbid sensation about death" did not grow out of any suicidal tendency, according to one expert, but was an effort to effect a reconciliation of the parents.

5. This is not to say that the mother may not have been guilty of indirect criminal contempt of court. But it is to say that before she can be tried and found guilty of such a crime a charge will have to be lodged against her by the state of Oklahoma. See *Ex parte Hibler, supra.*

while the mother did on July 15 violate the father's custodial rights granted in the Oklahoma court order, by the time the matter of enforcing the rights came on for hearing they, as we have already held, had been extinguished by the California modification. Thus with the father's rights abolished on August 13 there existed none to prospectively enforce on August 16.

Dismissal of the citation applied for by the father is therefore affirmed.

BACON, J., concurs.

NEPTUNE, J., concurs in result.